UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN

DR. JEFF HALL and DEANN NASH,

Plaintiffs,

v.

PAINT CREEK ESTATES, BRANDON SEMRAN, BETH WILLIAMS, FAITH ABOONA, PENNY BUXTON, VIVIAN LOPEZ, and ELIZABETH SEMRAN

Defendants.

Case No.
District Judge
Magistrate Judge

---

**COMPLAINT**
**AND JURY DEMAND**

Plaintiffs Dr. Jeff Hall and Deann Nash (collectively, "Plaintiffs") state as follows for their complaint against Defendants Paint Creek Estates, Brandon Semran, Beth Williams, Faith Aboona, Penny Buxton, and Elizabeth Semran (collectively, "Defendants"):

**Parties, Jurisdiction, and Venue**

1. Plaintiff Dr. Jeff Hall is an individual residing in Oakland County, Michigan.

2. Plaintiff Deann Nash is an individual residing in Oakland County, Michigan.

3. Defendant Paint Creek Estates is a Michigan nonprofit corporation conducting business in Oakland County, Michigan and maintaining its principal place of business in Oakland County, Michigan.

4. Defendant Brandon Semran is an individual residing in Oakland County, Michigan. He is the president of Paint Creek Estates.

5. Defendant Beth Williams is an individual residing in Oakland County, Michigan. She is the treasurer of Paint Creek Estates and a member of Paint Creek Estates Architectural Sub-Committee.

6. Defendant Faith Aboona is an individual residing in Oakland County, Michigan. She is the secretary of Paint Creek Estates.

7. Defendant Vivian Lopez is an individual residing in Oakland County, Michigan. She is a director of Paint Creek Estates.

8. Defendant Elizabeth Semran is an individual residing in Oakland County, Michigan. She is a director of Paint Creek Estates.

9. The Court has subject matter jurisdiction under 28 U.S.C. §1331 of Plaintiffs' claims for violations of the Fair Housing Act, 42 U.S.C. §§3604 and 3617, and violation of 42 U.S.C. §1981.

10. The Court has subject matter jurisdiction over the remaining claims under 28 U.S.C. §1367 because those claims are so related to Plaintiffs' federal claims that they form part of the same case or controversy under Article III of the United States Constitution.

11. Venue is proper under 28 U.S.C. §1391(b)(1) and (2) because all defendants reside in this judicial district, and because a substantial part of the events or omissions giving rise to the claims described in this complaint occurred in this judicial district.

## Factual Allegations

12. Paint Creek Estates (the "Association") was incorporated in 1996 to operate a residential condominium project located in Oakland Township, Michigan (the "Condominium").

13. The Condominium is a private, gated community made up of custom homes.

14. The Condominium originally consisted of 18 separate parcels of real property.

15. Each parcel of the Condominium is subject to a master deed and condominium bylaws (the "Bylaws") and is described as a "unit" under the Bylaws.

16. A copy of the Bylaws is attached as **Exhibit A**.

17. Four of the 18 lots in the Condominium remain undeveloped.

18. The developed lots include four-to-six-bedroom homes ranging in size from about 2,200 square feet to 6,900 square feet.

19. In addition to the significant difference in sizes, the homes vary in numerous other ways, including (a) the types, colors, and mixtures of facades; (b) the style, color, and materials of roofs; (c) the number, shape, size, and ornamentation of windows; (d) the shape, size, and ornamentation of main entryways; (e) the number of stories; and (f) the landscaping.

20. The homes were built between 1996 and the present.

21. Photographs of some of the existing homes in the Condominium are attached as **Exhibit B**.

22. In 2019, Plaintiffs purchased an undeveloped lot (No. 12) in the Condominium.

23. Plaintiffs are an interracial couple. Dr. Hall is African American, and Ms. Nash is white.

24. Other than Dr. Hall, there are currently no African American residents or owners of any unit in the Condominium.

25. Plaintiffs retained the design build firm, Luxe Homes Design Build (the "Architect"), to prepare plans for their new home.

26. The Architect reviewed the Bylaws and visited the Condominium to ensure that the plans for Plaintiffs' new home would conform to the requirements of the Bylaws and be approved by the Association.

27. In accordance with the Bylaws, Plaintiffs presented their plans to the Association's Architectural Sub-Committee.

28. A rendering of Plaintiffs' proposed home is attached as **Exhibit C**.

29. Beth Williams, a member of the Architectural Sub-Committee, is also the owner of the unit next door to the Plaintiffs.

30. She advised Plaintiffs that their plans were denied because "the contemporary design along with the color scheme does not match the traditional style and colors of the current architecture throughout the sub" and suggested that Plaintiffs "resubmit a more appropriate design that would blend with the other in the subdivision."

31. Williams's response was perplexing because there was no consistent color scheme in the Condominium, and it was unclear how Plaintiffs' "contemporary design" lacked the "traditional style and colors" of the other homes.

32. It was particularly perplexing in that a recently built home in the Condominium not only had a different color brick than the other homes in the Condominium, but was significantly smaller than the other homes and did not satisfy the minimum square footage requirements under the Bylaws.

33. Because of Williams's vague response, Plaintiffs requested clarification regarding what elements of the home design were objectionable.

34. Williams again responded for the Architectural Subcommittee, stating:

> The comments from the Committee were that the design of the house does not feel in harmony with the Condominium as a whole. For example, it appears that the exterior of the home is not brick but rather some sort of stone. We are fine with a brick/stone combination, but should be more consistent with the rest of the subdivision. The roofline or front elevation feels different than almost all of the homes in the subdivision. Also the number of windows in the front of the house, even the sides is not consistent with the rest of the subdivision."

35. This response was again perplexing because the Bylaws provide that "[a]ll residences shall have finished exteriors of brick, stone or wood or a combination thereof," and there are homes in the Condominium that are all brick, mostly brick with some stone, mostly stone with some brick, and mostly brick with some wood.

36. Moreover, the roofline and front elevations of the homes throughout the Condominium vary by the style and type of roof (e.g. gable, hipped, turret), the number of elevations (e.g. single or multiple), and the number of dormers, turrets, and cupolas (e.g. none or several).

37. The number of front-facing windows of homes throughout the Condominium also range significantly with one house having seven front facing windows and another having twenty.

38. Even though Williams's comments made little sense given the other variations in the other homes in the Condominium, Plaintiffs and the Architect met with the Architectural Sub-Committee to address the purported concerns.

39. During the meeting with the Architectural Sub-Committee, Plaintiffs offered to change the color of the stone, among other things.

40. The Architectural Sub-Committee rejected the plans and all proposed changes, and one member noted that construction of a home like this would "bring down his property value."

41. The statements about "property value" and the "number of windows" combined with the Architectural Sub-Committee's flimsy and vague excuses for rejecting the plan, refusal to seriously entertain any proposed modification to address its comments, and recent approval of another white-owned home that violated objective Bylaws specific square footage requirements and that had an entirely different color brick than any other home in the Condominium clearly demonstrated that the Architectural Sub-Committee was acting in bad faith and discriminating based on race.

42. Despite the Architectural Sub-Committee's bad faith and evident racial discrimination, Plaintiffs chose to bring the issue to the Condominium's Board with the hope that the matter could be resolved without litigation.

43. On April 23, 2022, Plaintiffs' attorney sent the Board President Brandon Semran a letter outlining the issues with the Architectural Sub-Committee's actions.

44. In response, the Association, through its counsel, reiterated the flimsy excuses and added some new pretexts for the denial of the plans, claiming that the other homes in the Condominiums had large two-storied entryways and ornamentation on doors and windows, including muntin bars.

45. The new pretexts were like the previous flimsy excuses in that other existing homes did not have large two-storied entryways and did not have the same ornamentation on doors and windows.

46. Indeed, there is a one-storied home currently being built in the Condominium that has a recessed entrance and another existing two-storied home with a recessed single-story entrance.

47. Moreover, Plaintiffs' plans include muntin bars on the windows.

48. The response also utterly ignored the concessions made by Plaintiffs, including changing the color of the stone, and further falsely stated that the existing homes had "limited, if any, stonework on" them.

49. While the response included many misstatements and continued to reject Plaintiffs' plans, the Association offered to have the Plaintiffs meet again with the Architectural Sub-Committee "to discuss alterations to the proposed plans."

50. Plaintiffs responded by noting the Association's misstatements, providing additional renderings of the proposed home to address the Association's concerns, and suggesting a meeting among the attorneys to settle the matter.

51. The Association refused to meet with Plaintiffs or their counsel, standing by their pretextual excuses and telling Plaintiffs to submit new plans.

52. The Association knew that its refusal to approve the plans or discuss reasonable modifications to those plans would leave Plaintiffs with the following bad options: (a) Plaintiffs could spend another $50,000 to have their architect draw up new plans to meet the Architectural Sub-Committee's vague demand for a "more appropriate design," which could easily be denied again; (b) Plaintiffs could sell the property and move to another area where they do not have to put up with the arbitrary, capricious, and discriminatory decisions of the Architectural Sub-Committee; or (c) Plaintiffs could bring this action, protecting their rights while pitting them against some of their future neighbors.

53. The Association also knew that refusing to approve the plans would delay Plaintiffs from constructing their home at a time when construction prices and interest rates on loans are skyrocketing, increasing Plaintiffs' costs even more and making it more likely that Plaintiffs will not be able to move into their new home in the Condominium.

54. In addition to the increased costs of construction, Defendants' actions have caused Plaintiffs to incur carrying costs of the Condominium property, like taxes and association fees, along with their current home, where they are forced to remain pending resolution of this matter.

55. Because of Defendants' actions, Plaintiffs experienced frustration, humiliation, embarrassment, and mental and emotional distress.

56. Plaintiffs' losses and injuries are continuing.

## Count I – Violation of the Fair Housing Act
## Against all Defendants

57. Under 42 U.S.C. §3604(b), it is unlawful for Defendants "[t]o discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection therewith, because of race, color, religion, sex, familial status, or national origin."

58. It is also unlawful under 42 U.S.C. §3617 for Defendants to "interfere with any person in the exercise or enjoyment of, or on account of his having exercised or enjoyed, or on account of his having aided or encouraged any other person in the exercise or enjoyment of, any right granted or protected by" 42 USCS §§3603, 3604, 3605, or 3606.

59. Defendants discriminated against Plaintiffs because of Dr. Hall's race when they interfered with Plaintiffs' ability to build their custom home in the Condominium and treated Plaintiffs' differently than white owners in the Condominium during the plan approval process.

60. Defendants' unlawful discrimination and interference with Plaintiffs' rights is a violation of 42 U.S.C. §§3604(b) and 3617.

61. As a result of Defendants' unlawful action, Plaintiffs have been damaged as alleged above.

62. Because of Defendants' unlawful actions, Plaintiffs are entitled under 42 U.S.C. §3613 to an award of actual and punitive damages, an order approving their plans, and attorney's fees and costs.

**Count II – Violation of 42 U.S.C. §1981**
**Against all Defendants**

63. Under 42 U.S.C. §1981(a), Dr. Hall has "the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other."

64. The term "make and enforce contracts" includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship.

65. Defendants violated Dr. Hall's rights under 42 U.S.C. §1981 by denying him his contractual right to build a custom home in the Condominium as has been enjoyed by white citizens under the Bylaws.

66. Defendants treated Dr. Hall differently than other white owners as evidenced by the fact that Defendants approved plans that not only contained purported elements similar to those in Plaintiffs' rejected plans but were not even allowed under the Bylaws.

67. Defendants action have caused Dr. Hall damages as alleged above.

68. Because of Defendants' violation of Dr. Hall's rights under 42 U.S.C. §1981, Dr. Hall is entitled to an award of actual, exemplary, and punitive damages, including attorney fees, under 42 U.S.C. §1988.

**Count III – Breach of Contract**
**Against the Association**

69. The Bylaws are a contract between the Association and Plaintiffs.

70. The Bylaws give the Association the right to refuse to approve construction plans that are not suitable or desirable for aesthetic or other reasons for the purpose of assuring the continued maintenance of the Condominium as a beautiful and harmonious residential development.

71. There is an implied promise under the Bylaws that neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract.

72. Because the Association's right to refuse to approve construction plans is discretionary, it must act in good faith.

73. By refusing to approve Plaintiffs' construction plans for specious reasons, refusing to engage in discussions for reasonable modifications to those plans, and applying its discretion differently based on the race, the Association has acted in bad faith and breached the Bylaws.

74. The Association's breach of the Bylaws has caused Plaintiffs' damages.

75. Because of the Association's breach of the Bylaws, Plaintiffs are entitled to an award of actual damages, an order requiring the Association to approve Plaintiffs' plans under the Bylaws, and attorney's fees and costs.

## Count III – Violation of Elliott-Larsen Civil Rights Act Against all Defendants

76. M.C.L. §37.2502(1) provides that "[a] person engaging in a real estate transaction … shall not on the basis of religion, race, color, national origin, age, sex, familial status, or marital status of a person or a person residing with that person: …(b) Discriminate against a person in the terms, conditions, or privileges of a real estate transaction or in the furnishing of facilities or services in connection with a real estate transaction."

77. The approval of Plaintiffs' plans under the Bylaws constitutes a real estate transaction under M.C.L. §37.2501(b).

78. By refusing to approve Plaintiffs' plans and treating white owners seeking plan approval differently than Plaintiffs, Defendants violated M.C.L. §37.2502(1)(b).

79. Defendants' violation caused Plaintiffs the damages alleged above.

80. Because of Defendants' violation of M.C.L. §37.2502(1)(b), Plaintiffs are entitled to an order requiring the Association to approve Plaintiffs' plans and an award of actual damages, attorney fees, and costs under M.C.L. §37.2801.

## Request for Relief

Plaintiffs request that the Court enter judgment in Plaintiffs' favor and against Defendants for all compensatory damages, exemplary damages, punitive

damages, and equitable and injunctive relief, to which the court finds them entitled, including but not limited to an order requiring the Association to approve Plaintiffs' plan under the Bylaws, together with costs, interest, and attorney fees.

**JURY DEMAND**

Plaintiffs request a jury trial on all issues so triable.

/s/ Brian C. Summerfield (P57514)
Schenk & Bruetsch PLC
211 West Fort Street, Suite 1410
Detroit, Michigan 48226
(313) 774-1000
Brian.Summerfield@SBDetroit.com
Attorney for Plaintiff

# EXHIBIT A

EXHIBIT A

# BYLAWS
# OF
# PAINT CREEK ESTATES

## ARTICLE I

## ASSOCIATION CO-OWNERS

Paint Creek Estates, a residential Condominium Project located in Oakland Township, Oakland County, Michigan, shall be administered by an Association of Co-owners which shall be a non-profit corporation, hereinafter called the "Association", organized under the applicable laws of the State of Michigan, and responsible for the management, maintenance, operation and administration of the Common Elements, easements and affairs of the Condominium Project in accordance with the Condominium Documents and the laws of the State of Michigan. These Bylaws shall constitute both the Condominium Bylaws referred to in the Master Deed and required by Section 3(8) of the Act and the Association Bylaws provided for under the Michigan Non-profit Corporation Act. Each Co-owner shall be entitled to membership. The share of a Co-owner in the funds and assets of the Association cannot be assigned, pledged or transferred in any manner except as an appurtenance to his Unit. The Association shall keep current copies of the Master Deed, all amendments to the Master Deed, and other Condominium Documents for the Condominium Project available at reasonable hours to Co-owners, prospective purchasers and prospective mortgagees of Units in the Condominium Project. All Co-owners in the Condominium Project and all persons using or entering upon or acquiring any interest in any Unit therein or the Common Elements thereof shall be subject to the provisions and terms set forth in the aforesaid Condominium Documents.

## ARTICLE II

## ASSESSMENTS

Section 1. <u>Assessments Against Units and Co-owners.</u> All expenses arising from the management, administration and operation of the Association in pursuance of its authorizations and responsibilities as set forth in the Condominium Documents and the Act shall be levied by the Association against the Units and the Owners thereof in accordance with the following provisions.

Section 2. <u>Assessment for Common Elements.</u> All costs incurred by the Association in satisfaction of any liability arising with, caused by, or connected with the Common Elements or

the administration of the Condominium Project shall constitute expenditures affecting the administration of the Project, and all sums received as the proceeds of, or pursuant to, any policy of insurance securing the interest of the Co-owners against liabilities or losses arising within, caused by, or connected with the Common Elements or the administration of the Condominium Project shall constitute receipt affecting the administration of the Condominium Project, within the meaning of Section 54(4) of the Act.

Section 3. Determination of Assessments. Assessment shall be determined in accordance with the following provisions:

(a) Budget. The Board of Directors of the Association shall establish an annual budget in advance for each fiscal year and such budget shall project all expenses for the forthcoming year which may be required for the proper operation, management and maintenance of the Condominium Project, including a reasonable allowance for contingencies and reserves. An adequate reserve fund for maintenance, repairs and replacement of those Common Elements that must be replaced on a periodic basis shall be established in the budget and must be funded by regular monthly payments as set forth in Section 4 below rather than by special assessments. At a minimum, the reserve fund shall be equal to 10% of the Association's current annual budget on a noncumulative basis. Since the minimum standard required by this subparagraph may prove to be inadequate for this particular project, the association of Co-owners should carefully analyze the Condominium Project to determine if a greater amount should be set aside, or if additional reserve funds should be established for other purposes from time to time. Upon adoption of the annual budget by the Board of Directors, copies of the budget shall be delivered to each Co-owner and the assessment for said year shall be established based upon said budget, although the delivery of a copy of the budget to each Co-owner shall not affect or in any way diminish the liability of any Co-owner for any existing or future assessments. Should the Board of Directors at any time determine, in the sole discretion of the Board of Directors: (1) that the assessments levied are or may prove to be insufficient to pay the costs of operation and management of the Condominium, (2) to provide replacements of existing Common Elements, (3) to provide additions to the Common Elements not exceeding $1,000.00 annually for the entire Condominium Project, or (4) in the event of emergencies, the Board of Directors shall have the authority, without Co-owner consent, to levy assessments, pursuant to the provisions of Article V, Section 1 hereof. The discretionary authority of the Board of Directors to levy assessments pursuant to this subparagraph shall rest solely with the Board of Directors for the benefit of the Association and the members thereof, and

shall not be enforceable by any creditors of the Association or the members thereof.

(b) Special Assessments. Special assessments, in addition to those required in subparagraph (a) above, may be made by the Board of Directors from time to time and approved by the Co-owners as hereinafter provided to meet other needs or requirements of the Association, including, but not limited to: (1) assessments for additions to the Common Elements of a cost exceeding $1,000.00 for the entire Condominium Project per year, Unit, or (2) assessments for any other appropriate purpose not elsewhere herein described. Special assessments referred to in this subparagraph (b) (but not including those assessments referred to in subparagraph 3(a) above, which shall be levied in the sole discretion of the Board of Directors) shall not be levied without the prior approval of more than 60% of all Co-owners in number and in value. The authority to levy assessments pursuant to this subparagraph is solely for the benefit of the Association and the members thereof and shall not be enforceable by any creditors of the Association or the members thereof.

Section 4. Apportionment of Assessments and Penalty for Default. Unless otherwise provided herein or in the Master Deed, all assessments levied against the Co-owners to cover expenses of administration shall be apportioned among and paid by the Co-owners in accordance with the percentage of value allocated to each Unit in Article V of the Master Deed, without increase or decrease for the existence of any right to the use of Limited Common Elements appurtenant to a Unit. Annual assessments as determined in accordance with Article II, Section 3(a) above shall be payable by Co-owners in 12 equal monthly installments, commencing with acceptance of a deed to or a land contract vendee's interest in a Unit, or with the acquisition of fee simple title to a Unit by any other means. The payment of an assessment shall be in default if such assessment, or any part thereof, is not paid to the Association in full on or before the due date for such payment. A late charge of 1% per month shall be assessed automatically by the Association upon any assessments in default for five or more days until installment together with the applicable late charges is paid in full. Each Co-owner (whether 1 or more persons) shall be, and remain, personally liable for the payment of all assessment (including fines for late payment and costs of collection and enforcement of payment) pertinent to his Unit which may be levied while such Co-owner is the owner thereof. Payments on accounts of installments of assessment in default shall be applied as follows: first, to costs of collection and enforcement of payment, including reasonable attorneys' fees; second, to any interest charges and fines for late payment on such installments; and third, to installments in default in order of their due dates.

Section 5. Waiver of Use or Abandonment of Unit. No Co-owner may exempt himself from liability for his contribution toward the expenses of administration by waiver of the use or enjoyment of any of the Common Elements or by the abandonment of his Unit.

Section 6. Enforcement.

(a) Remedies. In addition to any other remedies available to the Association, the Association may enforce collection of delinquent assessments by a suit at law for a money judgment or by foreclosure of the statutory lien that secures payment of assessments. In the event of default by any Co-owner in the payment of any installment of the annual assessment levied against his Unit, the Association shall have the right to declare all unpaid installments of the annual assessment for the pertinent fiscal year immediately due and payable. The Association also may discontinue the furnishing of any utilities or other services to a Co-owner in default upon 7 days' written notice to such Co-owner of its intention to do so. A Co-owner in default shall not be entitled to utilize any of the General Common Elements of the Project and shall not be entitled to vote at any meeting of the Association so long as such default continues; provided, however, this provision shall not operate to deprive any Co-owner of ingress or egress to and from his Unit. In a judicial foreclosure action, a receiver may be appointed to collect a reasonable rental for the Unit from the Co-owner thereof or any persons claiming under him. The Association may also assess fines for late payment or non-payment of assessments in accordance with the provisions of Article XIX, Section 4 of these Bylaws. All of these remedies shall be cumulative and not alternative.

(b) Foreclosure Proceedings. Each Co-owner, and every other person who from time to time has any interest in the Project, shall be deemed to have granted to the Association the unqualified right to elect to foreclose the lien securing payment of assessments either by judicial action or by advertisement. The provisions of Michigan law pertaining to foreclosure of mortgages by judicial action and by advertisement, as the same may be amended from time to time, are incorporated herein by reference for the purposes of establishing the alternative procedures to be followed in lien foreclosure actions and the rights and obligations of the parties to such actions. Further, each Co-owner and every other person who from time to time has any interest in the Project shall be deemed to have authorized and empowered the Association to sell or to cause to be sold the Unit with respect to which the assessment(s) is or are delinquent and to receive, hold and distribute the proceeds of such sale in accordance with the priorities established by applicable law. Each Co-owner of a Unit in the Project acknowledges that at

the time of acquiring title to such Unit, he was notified of the provisions of this subparagraph and that he voluntarily, intelligently and knowingly waived notice of any proceedings brought by the Association to foreclosure by advertisement the lien for non-payment of assessments and a hearing on the same prior to the sale of subject Unit.

(c) Notices of Action. Notwithstanding the foregoing, neither a judicial foreclosure action nor a suit at law for a money judgment shall be commenced, nor shall any notice of foreclosure by advertisement be published, until the expiration of 10 days after mailing, by first class mail, postage prepaid, addressed to the delinquent Co-owner(s) at his or their last known address, of a written notice that 1 or more installments of the annual assessment levied against the pertinent Unit is or are delinquent and that the Association may invoke any of its remedies hereunder if the default is not cured within 10 days after the date of mailing. Such written notice shall be accompanied by a written affidavit of an authorized representation of the Association that sets forth (i) the affiant's capacity to make the affidavit, (ii) the statutory and other authority for the lien, (iii) the amount outstanding (exclusive of interest, costs, attorney fees and future assessments), (iv) the legal description of the subject Unit(s), and (v) the name(s) of the Co-owner(s) of record. Such affidavit shall be recorded in the office of the Register of Deeds in the county in which the Project is located prior to commencement of any foreclosure proceeding, but it need not have been recorded as of the date of mailing as aforesaid. If the delinquency is not cured within the 10-day period, the Association may take such remedial action as may be available to it hereunder or under Michigan law. In the event the Association elects to foreclose the lien by advertisement, the Association shall so notify the delinquent Co-owner and shall inform him that he may request a judicial hearing by bringing suit against the Association.

(d) Expenses of Collection. The expenses incurred in collecting unpaid assessments, including interest, costs, actual attorneys' fees (not limited to statutory fees) and advances for taxes or other liens paid by the Association to protect its lien, shall be chargeable to the Co-owner in default and shall be secured by the lien on his Unit.

Section 7. Liability of Mortgagee. Notwithstanding any other provisions of the Condominium Documents, the holder of any first mortgage covering any Unit in the Project which comes into possession of the Unit pursuant to the remedies provided in the mortgage or by deed (or assignment) in lieu of foreclosure, or any purchaser at a foreclosure sale, shall take the property free of any claims for unpaid assessments or charges against the mortgaged Unit which accrue prior to the time such holder comes into

possession of the Unit (except for claims for a pro rata share of such assessments or charges resulting from a pro rata reallocation of such assessments or charges to all Units including the mortgaged Unit).

Section 8. <u>Developer's Responsibility for Assessments.</u> The Developer of the Condominium, although a member of the Association, shall not be responsible at any time for payment of the monthly Association assessment. The Developer, however, shall at all times pay all expenses of maintaining the Units that it owns, including the improvements located thereon, together with a proportionate share of all current expenses of administration actually incurred by the Association from time to time, except expenses related to maintenance and use of the Units in the Project and of the improvements constructed within or appurtenant to the Units that are not owned by Developer. For purposes of the foregoing sentence, the Developer's proportionate share of such expenses shall be based upon the ratio of all Units owned by the Developer at the time the Expense is incurred to the total number of Units then in the Project. In no event shall the Developer be responsible for payment of any assessments for deferred maintenance, reserves for replacement, for capital improvements or other special assessments, except with respect to Units owned by it on which a completed building is located. For instance, the only expense presently contemplated that the Developer might be expected to pay is a pro rata share of snow removal and other road maintenance from time to time as well as a pro rata share of any administrative costs which the Association might incur from time to time. Any assessments levied by the Association against the Developer for other purposes shall be void without Developer's consent. Further, the Developer shall in no event be liable for any assessment levied in whole or in part to purchase any Unit from the Developer or to finance any litigation or other claims against the Developer, any cost of litigation or other claims against the Developer, any cost of investigating and preparing such litigation or claim or any similar or related costs. A "completed building" shall mean a building with respect to which a certificate of occupancy has been issued by Oakland Township.

Section 9. <u>Property Taxes and Special Assessments.</u> All property taxes and special assessments levied by any public taxing authority shall be assessed in accordance with Section 131 of the Act.

Section 10. <u>Personal Property Tax Assessment of Association Property.</u> The Association shall be assessed as the person or entity in possession of any tangible personal property of the Condominium owned or possessed in common by the Co-owners, and personal property taxes based thereon shall be treated as expenses of administration.

Section 11. Mechanic's Lien. A mechanic's lien otherwise arising under Act No. 497 of the Michigan Public Acts of 1980, as amended, shall be subject to Section 132 of the Act.

Section 12. Statement as to Unpaid Assessments. The purchaser of any Unit may request a statement of the Association as to the amount of any unpaid Association assessments thereon, whether regular or special. Upon written request to the Association accompanied by a copy of the executed purchase agreement pursuant to which the purchaser holds the right to acquire a Unit, the Association shall provide a written statement of such unpaid assessments as may exist or a statement that none exist, which statement shall be binding upon the Association for the period stated therein. Upon the payment of that sum within the period stated, the Association's lien for assessments as to such Unit shall be deemed satisfied; provided, however, that the failure of a purchaser to request such statement at least 5 days prior to the closing of the purchase of such Unit shall render any unpaid assessments and the lien securing same fully enforceable against such purchaser and the Unit itself, to the extent provided by the Act. Under the Act, unpaid assessments constitute a lien upon the Unit and the proceeds of sale thereof prior to all claims except real property taxes and first mortgages of record.

ARTICLE III

ARBITRATION

Section 1. Scope and Election. Disputes, claims, or grievances arising out of or relating to the interpretation or the application of the Condominium Documents, or any disputes, claims or grievances arising among or between the Co-owners and the Association, upon the election and written consent of the parties to any such disputes, claims or grievances (which consent shall include an agreement of the parties that the judgment of any circuit court of the State of Michigan may be rendered upon any award pursuant to such arbitration), and upon written notice to the Association, shall be submitted to arbitration and the parties thereto shall accept the arbitrator's decision as final and binding, provided that no question affecting the claim of title of any person to any fee or life estate in real estate in involved. The Commercial Arbitration Rules of the American Arbitration Association as amended and in effect from time to time hereafter shall be applicable to any such arbitration.

Section 2. Judicial Relief. In the absence of the election and written consent of the parties pursuant to Section 1 above, no Co-owner or the Association shall be precluded from petitioning the courts to resolve any such disputes, claims or grievances.

Section 3. Election of Remedies. Such election and written consent by Co-owners or the Association to submit any such dispute, claim or grievance to arbitration shall preclude such parties from litigating such dispute, claim or grievance in the courts.

ARTICLE IV

INSURANCE

Section 1. Extent of Coverage. The Association shall, to the extent appropriate in light of the nature of the General Common Elements of the Project, carry liability insurance, if applicable, and any other insurance the Association may deem applicable, desirable or necessary, pertinent to the ownership, use and maintenance of the Common Elements and administration of the Condominium Project. Each Co-owner shall be obligated and responsible for obtaining fire and extended coverage and vandalism and malicious mischief insurance with respect to the building and all other improvements constructed or to be constructed within the perimeter of his Condominium Unit and its appurtenant Limited Common Element Yard Areas and for his personal property located therein or thereon or elsewhere on the Condominium Project. Each Co-owner also shall be obligated to obtain insurance coverage for his personal liability for occurrences within the perimeter of his Unit and appurtenant Limited Common Element Yard Area or the improvements located thereon, and also for any other personal insurance coverage that the Co-owner wishes to carry. The Association shall under no circumstances have any obligation to obtain any of the insurance coverage required to be carried by a Co-owner.

Section 2. Indemnification. Each individual Co-owner shall indemnify and hold harmless every other Co-owner, the Developer and the Association for all damages and costs, including attorneys' fees, which such other Co-owners, the Developer or the Association may suffer as a result of defending any claim arising out of an occurrence on or within such individual Co-owner's Unit or appurtenant Limited Common Element Yard Area and shall carry insurance to secure this indemnity if so required by the Association (or the Developer during the Development and Sales Period). This Section 2 shall not be construed to give any insurer any subrogation right or other right to claim against any individual Co-owner, however.

## ARTICLE V

## RECONSTRUCTION OR REPAIR

Section 1. Association Responsibility for Repair. Immediately after a casualty causing damage to a General Common Element, the Association shall obtain reliable and detailed estimates of the cost to replace the damaged property in a condition as good as that existing before the damage. If the proceeds of insurance are not sufficient to defray the estimated costs of reconstruction or repair required to be performed by the Association, or if at any time during such reconstruction or repair, or upon completion of such reconstruction or repair, the funds for the payment of the cost thereof are insufficient, assessment shall be made against all Co-owners for the cost of reconstruction or repair of the damaged property in sufficient amounts to provide funds to pay the estimated or actual cost of repair.

Section 2. Timely Reconstruction and Repair. If damage to the General Common Elements adversely affects the appearance or utility of the Project, the Association shall proceed with replacement of the damaged property without delay.

Section 3. Co-owner's Responsibility. Each Co-owner shall be responsible for all maintenance, repair and replacement required within his Unit or the Limited Common Element Yard Area appurtenant thereto.

Section 4. Eminent Domain. The following provisions shall control upon any taking by eminent domain.

(a) Taking of Unit or Improvements Thereon. In the event of any taking of an entire Unit or any improvements thereon by eminent domain, the award for such taking shall be paid to the Co-owner of such Unit and the mortgagee thereof, as their interests may appear, notwithstanding any provision of the Act to the contrary. After acceptance of such award by the Co-owner and his mortgagee, they shall be divested of all interest in the Condominium Project.

(b) Taking of General Common Elements. If there is any taking of any portion of the General Common Elements, the condemnation proceeds relative to such taking shall be paid to the Co-owners and their mortgagees in proportion to their respective interests in the Common Elements and the affirmative vote of more than 50% of the Co-owners in number and in value shall determine whether to rebuild, repair or replace the portion so taken or to take such other action as they deem appropriate.

(c) Continuation of Condominium After Taking. In the event the Condominium Project continues after taking by eminent domain, then the remaining portion of the Condominium Project shall be re-surveyed and the Master Deed amended accordingly, and, if any Unit shall have been taken, then Article V of the Master Deed shall also be amended to reflect such taking and to proportionately readjust the percentages of value of the remaining Co-owners based upon the continuing value of the Condominium of 100%. Such amendment may be effected by an officer of the Association duly authorized by the Board of Directors without the necessity of execution or specific approval thereof by any Co-owner.

(d) Notification of Mortgagees. In the event any Unit in the Condominium, or any portion thereof, or the Common Elements or any portion thereof, is made the subject matter of any condemnation or eminent domain proceeding or is otherwise sought to be acquired by a condemning authority, the Association shall so notify each institutional holder of a first mortgage lien on any of the Units in the Condominium.

(e) Applicability of the Act. To the extent not inconsistent with the foregoing provisions, Section 133 of the Act shall control upon any taking by eminent domain.

Section 5. Priority of Mortgagee Interests. Nothing contained in the Condominium Documents shall be construed to give a Condominium Unit Owner, or any other party, priority over any rights of first mortgagees of Condominium Units pursuant to their mortgages in the case of a distribution to Condominium Unit Owners of insurance proceeds or condemnation awards for losses to or a taking of Condominium Units and/or Common Elements.

## ARTICLE VI

## RESTRICTIONS

All of the Units in the Condominium shall be held, used and enjoyed subject to the following limitations and restrictions:

Section 1. Residential Use. No Unit in the Condominium shall be used for other than single-family residence purposes and the Common Elements shall be used only for purposes consistent with single-family residential use. No building of any kind shall be erected except private residences and structures ancillary thereto. Only one residence may be erected within any Unit.

Section 2. Leasing and Rental.

(a) Right to Lease. A Co-owner may lease his Unit for the same purposes set forth in Section 1 of this Article VI;

provided that written disclosure of such lease transaction is submitted to the Board of Directors of the Association in the manner specified in subsection (b) below. With the exception of a lender in possession of a Unit following default of a first mortgage, foreclosure or deed or other arrangement in lieu of foreclosure, no Co-owner shall lease less than an entire Unit in the Condominium and no tenant shall be permitted to occupy except under a lease the initial term of which is at least 6 months unless specifically approved in writing by the Association. The terms of all leases, occupancy agreement and occupancy arrangements shall incorporate, or be deemed to incorporate, all of the provisions of the Condominium Documents.

(b) Leasing Procedures. The leasing of Units in the Project shall conform to the following provisions:

(1) A Co-owner desiring to rent or lease a Unit, shall disclose that fact in writing to the Association at least 10 days before presenting a lease form to a potential lessee of the Unit and at the same time, shall supply the Association with a copy of the exact lease form for its review for its compliance with the Condominium Documents.

(2) Tenants or non co-owner occupants shall comply with all of the conditions of the Condominium Documents of the Condominium Project and all leases and rental agreements shall so state.

(3) If the Association determines that the tenant or non co-owner occupant has failed to comply with the conditions of the Condominium Document, the Association shall take the following action:

(i) The Association shall notify the Co-owner by certified mail advising of the alleged violation by the tenant.

(ii) The Co-owner shall have 15 days after receipt of such notice to investigate and correct the alleged breach by the tenant or advise the Association that a violation has not occurred.

(iii) If after 15 days the Association believes that the alleged breach is not cured or may be repeated, it may institute on its behalf or derivatively by the Co-owners on behalf of the Association, if it is under the control of the Developer, an action for eviction against the tenant or non co-owner occupant and simultaneously for money damages in the same action against the Co-

owner and tenant or non co-owner occupant for breach of the conditions of the Condominium Documents. The relief provided for in this subparagraph may be by summary proceeding. The Association may hold both the tenant and the Co-owner liable for any damages to the Common Elements caused by the Co-owner or tenant in connection with the Unit or Condominium Project and for actual legal fees incurred by the Association in connection with legal proceedings hereunder.

(4) When a Co-owner is in arrears to the Association for assessments, the Association may give written notice of the arrearage to a tenant occupying a Co-owner's Unit under a lease or rental agreement and the tenant, after receiving the notice, shall deduct from rental payments due the Co-owner the arrearage and future assessments as they fall due and pay them to the Association. The deductions shall not constitute a breach of the rental agreement or lease by the tenant. The form of lease used by any Co-owner shall explicitly contain the foregoing provisions.

Section 3. Architectural Control.

(a) No building, structure or other improvement shall be constructed or landscaping installed within a Condominium Unit or elsewhere within the Condominium Project, nor shall any exterior modification be made to any existing buildings, structure or improvement, unless plans and specifications therefor, containing such detail as the Developer may reasonably request, have first been approved in writing by the Developer. Construction of any building or other improvements must also receive any necessary approvals from the local public authority. Developer shall have the right to refuse to approve any such construction plans or specifications, or grading or landscaping plans, which are not suitable or desirable in its opinion for aesthetic or other reasons; and in passing upon such plans and specifications it shall have the right to take into consideration the suitability of the proposed structure, improvement, modification or landscaping, the site upon which it is proposed to be constructed and the degree of harmony thereof with the Condominium as a whole. Developer may also, in its discretion, require as a condition of approval of any plans, an agreement for special assessment of increased maintenance charges from any Co-owner whose proposed building, appurtenances and related improvements will cause the Association abnormal expenses in carrying out its responsibilities under the Master Deed. The purpose of this Section is to assure the continued maintenance of the Condominium as a beautiful and harmonious residential development, and shall be binding upon both the Association

and upon all Co-owners. Developer's rights under this Article VI, Section 3, may, in Developer's discretion, be assigned to the Association or other successor to Developer. Developer may construct any improvements or effect any landscaping upon the Condominium without the necessity of prior consent from the Association or any other person or entity, subject only to the express limitations contained in the Condominium Documents.

(b) Construction Materials. All residences shall have finished exteriors of brick, stone or wood or a combination thereof. All exterior paints, stains and material colors must be shown as a part of the plans submitted for approval and which must be approved by Developer; samples thereof shall be furnished to Developer upon request. Visible exteriors of cement, slag or aluminum shall be limited to not more than 15% of the visible exterior. The Developer shall have the right to approve reasonable deviations from these requirements.

(c) Size of Residences. No residence shall be hereinafter constructed on any Unit of less than the following sizes of finished living areas as calculated on exterior dimensions, exclusive of porches, patios, garages and basements:

| | Unit Nos. 2,3,4,5,6,7,8, 9,10,11,12,13,14 | Unit Nos. 1,15,16,17,18, 19,20 |
|---|---|---|
| One Story Home | 3600 square feet | 3100 square feet |
| Bi-Level Home | 4100 square feet minimum, including 2600 square feet of ground coverage | 3100 square feet minimum, including 2000 square feet of ground coverage |
| One and one-half Story Home | 4100 square feet minimum, including 2600 square feet of ground coverage | 3100 square feet minimum, including 2000 square feet of ground coverage |
| Tri-Level Home | 4100 square feet minimum, including 2600 square feet of ground coverage | 3100 square feet minimum, including 2000 square feet of ground coverage |
| Two Story Home | 4100 square feet minimum, including 2600 square feet of ground coverage | 3100 square feet minimum, including 2000 square feet of ground coverage |

The length of any residence constructed on Units No. 1, 15, 16, 17, 18, 19, 20 shall not be less than 70 feet, unless such residence meets the minimum square footage requirements for those of the remaining Units set out above in this subpart (c). For purposes of calculating the length of a residence under this Section 3, only those portions of the residence

covered by a roof shall be included.

(d) No building, structure or improvement shall be placed, erected, altered or located on any Homesite nearer to the front, side or rear lot line than is permitted by ordinances of Oakland Township at the time the same is erected. In addition, any dwelling or building shall meet the following setback requirements:

(i) Front yard setbacks - a minimum of 50 feet.

(ii) Side yard setbacks - a minimum of 20 feet.

(iii) Rear yard setbacks - a minimum of 55 feet.

Section 4. Public Health Requirements. The provisions hereinafter set forth have been required by the Michigan Department of Public Health and the Oakland County Health Division. Permits for the installation of wells shall be obtained from the Oakland County Health Division prior to any construction on the individual building sites. Each Co-owner shall be solely responsible for installation, maintenance, repair and replacement of the well/water supply system on his building site and the Association shall have absolutely no financial responsibility or other duty with respect thereto. All wells installed for private water supply must, except as set forth below, penetrate an adequate protective clay overburden and prospective building site owners are hereby advised of and agree to this requirement. When an adequate aquiclude cannot be demonstrated, additional safeguards in the form of increased distance and/or depth requirements may be required. According to the submitted test well results, it is estimated by the Michigan Department of Public Health, the Oakland County Health Division and the Developer that water wells will need to be generally 76 feet to 215 feet deep in order to penetrate an aquiclude.

All residential dwellings shall be served by an appropriate potable water supply system constructed in accordance with the Groundwater Quality Control provisions of the Michigan Public Health Code P.A. 368 of 1978, as amended, and, in particular, with Part 127 thereof. All wells on individual sites shall be drilled by a well driller licensed by the State of Michigan to a depth of not less than twenty five (25') feet and a complete well log for each such potable water well shall be submitted to the Oakland County Health Division within sixty (60) days following completion of such well. A well drilled in accordance with this provision shall be deemed to be an appropriate water supply system.

At some time subsequent to the initial development, it may become necessary to construct a community water supply. The construction of such public system, may be financed, in whole or in part, by the creation of a special assessment district or districts

which may include all site Condominium Units in Paint Creek Estates. The acceptance of conveyance or the execution of a land contract by any Owner or purchaser shall constitute the agreement by such owner or purchaser, his heirs, executors, administrators and assigns that such owner or purchaser will execute any petition circulated for the purpose of creating such a special assessment district. The Board of Directors of the Association shall be vested with full power and authority to obligate all Co-owners to participate in a special assessment district or districts and to consider and act upon all other community water issues on behalf of the Association and all Co-owners. Further, each Owner will pay such special assessments as may be levied against his site Condominium Unit by any such special assessment district and shall take the necessary steps as required by the appropriate state, county and township agencies and by the Association acting through its Board of Directors to connect, at his own expense, his water intake facilities to such community water supply system within ninety (90) days following the completion of said system.

Section 5. Alterations and Modifications. No Co-owner shall make alterations in exterior appearance or make structural modifications to his Unit including without limitation, the design, color or material of windows, doors, screens, roofs, siding or any other component which is visible from a Common Element or other Unit (including interior walls through or in which there exist easements for support or utilities) or make changes in any of the Common Elements, Limited or General, without the express written approval of the Association, including without limitation installation of outdoor hot tubs and whirlpools, landscaping, exterior painting or the erection of antennas, lights, aerials, awnings, flag poles, or any other attachments or modifications. Basketball hoops or backboards shall not be permitted. No fences shall be permitted except decorative fences attached to a residence and fences surrounding inground swimming pools. No Co-owner shall in any way restrict access to any utility line or any element which affects an Association responsibility in any way. No above-ground swimming or wading pools, lawn ornaments, sculptures or statues shall be placed, erected or permitted to remain on any Unit or surrounding Limited Common Element Yard Area.

Section 6. Activities. No immoral, improper, unlawful or offensive activities shall be carried on in any Unit or upon the Common Elements, Limited or General, nor shall anything be done which may be or become an annoyance or a nuisance to the Co-owners of the Condominium. No unreasonably noisy activity shall occur in or on the Common Elements or in any Unit at any time and disputes among Co-owners, arising as a result of this provision which cannot be amicably resolved, shall be arbitrated by the Association. No Co-owner shall do or permit anything to be done or keep or permit to be kept in his Unit or on the Common Elements anything that will increase the rate of insurance on the Condominium without the written approval of the Association, and each Co-owner shall pay to

the Association the increased cost of insurance premiums resulting from any such activity or the maintenance of any such condition even if approved. Activities which are deemed offensive and are expressly prohibited include, but are not limited to, the following: Any activities involving the use of firearms, air rifles, pellet guns, B-B guns, bows and arrows, and other similar dangerous weapons, projectiles or devices.

Section 7. Pets. No Co-owner may maintain more than 3 dogs or 3 cats or any combination of 4 animals. No animal may be kept or bred for any commercial purpose and shall have such care and restraint so as not to be obnoxious or offensive on account of noise, odor or unsanitary conditions. No animal may be permitted to run loose at any time upon the Common Elements and any animal shall at all times be leashed and attended by some responsible person while on the Common Elements, Limited or General. No savage or dangerous animal shall be kept and any Co-owner who causes any animal to be brought or kept upon the premises of the Condominium shall indemnify and hold harmless the Association for any loss, damage or liability which the Association may sustain as the result of the presence of such animal on the premises, whether or not the Association has given its permission therefor. The Association may charge all Co-owners maintaining animals a reasonable additional assessment to be collected in the manner provided in Article II of these Bylaws in the event that the Association determines such assessment is necessary to defray the maintenance cost to the Association of accommodating animals within the Condominium. The Association may adopt such additional reasonable rules and regulations with respect to animals as it may deem proper. In the event of any violation of this Section, the Board of Directors of the Association may assess fines for such violation in accordance with these Bylaws and in accordance with duly adopted Rules and Regulations.

Section 8. Aesthetics. The Common Elements, Limited or General, shall not be used for storage of supplies, materials, personal property or trash or refuse of any kind, except as provided in duly adopted Rules and Regulations of the Association. No exterior radio, television aerial, antenna, satellite dish or other reception or transmission device shall be placed, constructed, altered or maintained on any Unit or surrounding Limited Common Element Area without the prior written consent of the Board of Directors, which the Board of Directors may withhold in its sole discretion. Trash receptacles shall not be permitted to remain on the Common Elements except for such short periods of time as may be reasonably necessary to permit periodic collection of trash. No refuse pile or other unsightly or objectionable materials shall be allowed on any Unit or surrounding Limited Common Element Area. The Common Elements shall not be used in any way for the drying, shaking, or airing of clothing or other fabrics. In general, no activity shall be carried on nor condition maintained by a Co-owner, either in his Unit or upon the Common

Elements, which is detrimental to the appearance of the Condominium. Without written approval by the Association, no Co-owner shall change in any way the exterior appearance of the residence and other improvements and appurtenances located within his Unit. Thus, in connection with any maintenance, repair, replacement, decoration or redecoration of such residence, improvements or appurtenances, no Co-owner shall modify the design, material or color of any such item including, without limitation, windows, doors, screens, roofs, siding or any other components which is visible from a Common Element or other Unit.

Section 9. Vehicles. No house trailers, commercial vehicles, boat trailers, boats, camping vehicles, camping trailers, motorcycles, all terrain vehicles, snowmobiles, snowmobile trailers or vehicles, other than automobiles or vehicles used primarily for general personal transportation use, may be parked or stored upon the premises of the Condominium, unless in garages. Passenger vehicles shall be parked in garages to the extent possible. Garage doors shall be kept closed when not in use. No inoperable vehicles of any type may be brought or stored upon the Condominium Premises either temporarily or permanently. Commercial vehicles and trucks shall not be parked in or about the Condominium (except as above provided) unless while making deliveries or pickups in the normal course of business. No parking on any road within the Condominium premises, except in connection with special events, is permitted without the Association's prior approval.

Section 10. Advertising. No signs or other advertising devices of any kind shall be displayed which are visible from the exterior of a Unit or on the Common Elements, including "For Sale" signs, without written permission from the Association and, during the Construction and Sales Period, from the Developer except as follows:

(a) During construction of a dwelling, a sign may be erected so as to identify the Unit number and the name of the builder, but only if the Developer provides written authority for the erection of the sign. The Developer may withhold such authority in its sole discretion. The size, location, color and content of any sign permitted by the Developer shall be as specified by the Developer.

(b) A street address sign shall be erected in connection with the construction of a dwelling on a Unit. The size, content, location and color of the sign shall be specified by the Developer.

Section 11. Rules and Regulations. It is intended that the Board of Directors of the Association may make Rules and Regulations from time to time to reflect the needs and desires of the majority of the Co-owners in the Condominium. Reasonable regulations consistent with the Act, the Master Deed and these

Bylaws concerning the use of the Common Elements may be made and amended from time to time by any Board of Directors of the Association, including the first Board of Directors (or its successors) prior to the Transitional Control Date. Any such regulation or amendment may be revoked at any time by the affirmative vote of more than 50% of the Co-owners in number and value, except that the Co-owners may not revoke any regulation or amendment prior to the First Annual Meeting of the entire Association.

Section 12. Right of Access of Association. The Association or its duly authorized agents shall have access to each Unit and any Limited Common Elements appurtenant thereto from time to time with permission from the Co-owner thereof, during reasonable working hours, upon notice to the Co-owner thereof, as may be necessary for the maintenance, repair or replacement of any of the Common Elements. Such permission by the Co-owner shall not be unreasonably withheld. The Association or its agents shall also have access to any Limited Common Elements appurtenant at all times without notice as may be necessary to make emergency repairs to prevent damage to the Common Elements or to another Unit. It shall be the responsibility of each Co-owner to provide the Association means of access to his Unit and any Limited Common Elements appurtenant during all periods of absence, and in the event of the failure of such Co-owner to provide means of access, the Association may gain access in such manner as may be reasonable under the circumstances and shall not be liable to such Co-owner for any necessary damage to his Unit and any Limited Common Elements appurtenant thereto caused thereby or for repair or replacement of any doors or windows damaged in gaining such access.

Section 13. Snow Plowing and/or Shoveling. The Association shall if not handled by the Township, contract for the removal of snow from asphalt areas located within Common Element areas as well as any parking and driveways, porches and front walkways forming a part of a Common Element. Such snow removal may not be done at times that the snow accumulation is considered by Developer or the Association to be of any amount as not to cause vehicular traffic any substantial difficulty.

Individual Condominium Owners desiring their respective driveways plowed by the same contractor plowing the road shall contact such snow plowing contractor(s) individually and directly and such Condominium Owner shall be solely responsible for any cost or expense incurred for such individual driveway snow plowing. The Association may, in its discretion, coordinate such private snow plowing activities if it, in its sole discretion deems it appropriate.

Section 14. Common Elements Maintenance. Sidewalks, if any, yards, landscaped areas, driveways, roads, parking areas and porches shall not be obstructed nor shall they be used for purposes

other than for which they are reasonably and obviously intended. No bicycles, vehicles, chairs or other obstructions may be left unattended on or about the Common Elements.

Section 15. Co-owner Maintenance. Each Co-owner shall maintain his Unit and any Limited Common Elements appurtenant thereto in a safe, clean and sanitary condition. Each Co-owner shall also use due care to avoid damaging any of the Common Elements including, but not limited to, the telephone, water, gas, plumbing, electrical or other utility conduits and systems and any other elements in any Unit which are appurtenant to or which may affect any other Unit. Each Co-owner shall be responsible for damages or costs to the Association resulting from negligent damage to or misuse of any of the Common Elements by him, or his family, guests, agents or invitees, unless such damages or costs are covered by insurance carried by the Association (in which case there shall be no such responsibility, unless reimbursement to the Association is excluded by virtue of a deductible provision in which case the responsible Co-owner shall bear the expense to the extent of the deductible amount). Any costs or damages to the Association may be assessed to and collected from the responsible Co-owner in the manner provided in Article II hereof.

Section 16. Reserved Rights of Developer.

(a) Developer's Rights in Furtherance of Development and Sales. None of the restrictions contained in this Article VI shall apply to the Commercial activities or signs or billboards, if any, of the Developer during the Construction and Sales Period or of the Association in furtherance of its powers and purposes set forth herein and in the Articles of Incorporation, as the same may be amended from time to time. Notwithstanding anything to the contrary elsewhere herein contained, Developer shall have the right to maintain a sales office, a business office, a construction office, model units, storage areas and reasonable parking incident to the foregoing and such access to, from and over the Project as may be reasonable to enable development and sale of the entire Project by Developer, and may continue to do so during the entire Construction and Sales Period. Developer shall restore the areas so utilized to habitable status upon termination of use.

(b) Enforcement of Bylaws. The Condominium Project shall at all times be maintained in a manner consistent with the highest standards of a beautiful, serene, private, residential community for the benefit of the Co-owners and all persons interested in the Condominium. If at any time the Association fails or refuses to carry out its obligation to maintain, repair, replace and landscape in a manner consistent with the maintenance of such high standards, then Developer, or any entity to which it may assign this right, at its

option, may elect to maintain, repair and/or replace any Common Elements and/or to do any landscaping required by these Bylaws and to charge the cost thereof to the Association as an expense of administration. The Developer shall have the right to enforce these Bylaws throughout the Construction and Sales Period notwithstanding that it may no longer own a Unit in the Condominium which right of enforcement may include (without limitation) an action to restrain the Associati..n or any Co-owner from any activity prohibited by these Bylaws.

(c) Prior Approval by Developer. During the Development and Sales Period, no buildings, fences, walls, retaining walls, drives, walks or other structures or improvements shall be commenced, erected, maintained, nor shall any addition to, or change or alteration to any structure be made (including in color or design), except interior alterations which do not affect structural elements of any Unit, nor shall any hedges, trees or substantial plantings or landscaping modifications be made, until plans and specifications, acceptable to the Developer, showing the nature, kind, shape, height, materials, color scheme, location and approximate cost of such structure or improvements and the grading or landscaping plan of the area to be affected shall have been submitted to and approved in writing by Developer, its successors or assigns, a copy of said plans and specifications, as finally approved, lodged permanently with the Developer. The Developer shall have the right to refuse to approve any such plan or specifications, or grading or landscaping plans which are not suitable or desirable in its opinion for aesthetic or other reasons; and in passing upon such plans, specifications, grading or landscaping, it shall have the right to take into consideration the suitability of the proposed structure, improvement or modification, the site upon which it is proposed to effect the same, and the degree of harmony thereof with the Condominium as a whole. The purpose of this Section is to assure the continued maintenance of the Condominium as a beautiful and harmonious residential development, and shall be binding upon both the Association and upon all Co-owners.

## ARTICLE VII

## MORTGAGES

Section 1. Notice to Association. Any Co-owner who mortgages his Unit shall notify the Association of the name and address of the mortgagee, and the Association shall maintain such information in a book entitled "Mortgages of Units". The Association may, at the written request of a mortgagee of any such Unit, report any unpaid assessments due from the Co-owner of such Unit. The Association shall give to the holder of any first mortgage covering any Unit in the Project written notification of

any default in the performance of the obligations of the Co-owner of such Unit that is not cured within 60 days.

Section 2. Insurance. The Association shall notify each mortgagee appearing in said book of the name of each company insuring the Condominium against fire, perils covered by extended coverage, and vandalism and malicious mischief and the amounts of such coverage.

Section 3. Notification of Meetings. Upon request submitted to the Association, any institutional holder of a first mortgage lien on any Unit in the Condominium shall be entitled to receive written notification of every meeting of the members of the Association and to designate a representative to attend such meeting.

## ARTICLE VIII

## VOTING

Section 1. Vote. Except as limited in these Bylaws, each Co-owner shall be entitled to one vote for each Condominium Unit owned when voting by number and one vote, the value of which shall equal the total of the percentages allocated to the Unit owned by such Co-owner as set forth in Article V of the Master Deed, when voting by value. Voting shall be by value except in those instances when voting is specifically required to be both in value and in number.

Section 2. Eligibility to Vote. No Co-owner, other than the Developer, shall be entitled to vote at any meeting of the Association until he has presented evidence of ownership of a Unit in the Condominium Project to the Association. Except as provided in Article X, Section 2 of these Bylaws, no Co-owner, other than the Developer, shall be entitled to vote prior to the date of the First Annual Meeting of members held in accordance with Section 2 of Article VIII. The vote of each Co-owner may be cast only by the individual representative designated by such Co-owner in the notice required in Section 3 of this Article VIII below or by a proxy given by such individual representative. The Developer shall be the only person entitled to vote at a meeting of the Association until the First Annual Meeting of members and shall be entitled to vote during such period notwithstanding the fact that the Developer may own no Units at some time or from time to time during such period. At and after the First Annual Meeting the Developer shall be entitled to vote for each Unit which it owns.

Section 3. Designation of Voting Representative. Each individual Co-owner who is a natural person shall automatically be the designated voting representative who shall vote at meetings of the Association and receive all notices and other communications

from the Association on behalf of such Co-owner. Where two or more natural persons are Co-owners of a Unit, then notices from the Association shall be addressed to all such persons at the Unit and any one of such Co-owners shall be entitled to vote at meetings of the Association; provided, however, that no such Co-owner shall be entitled to vote if such Co-owners cannot agree as to who will cast the vote. In the event of ownership of a Unit by an unnatural person, such as a corporation or trust, a written notice designating the person who may vote at Association meetings and receive notices shall be filed with the Association. Such notice shall state the name and address of the individual representative designated, the number or numbers of the Unit or Units owned by the Co-owner, and the name and address of each person, firm, corporation, partnership, association, trust or other legal entity who is the Co-owner. Such notice shall be signed and dated on behalf of the Co-owner. If the Co-owner is a corporation, partnership or other similar entity, then only an authorized agent thereof shall be the designated voting representative. Such designee may be changed by the Co-owner at any time by filing a new notice in the manner herein provided.

Section 4. Quorum. The presence in person or by proxy of 35% of the Co-owners in number and in value qualified to vote shall constitute a quorum for holding a meeting of the members of the Association, except for voting on questions specifically required by the Condominium Documents to require a greater quorum. The written vote of any person furnished at or prior to any duly called meeting at which meeting said person is not otherwise present in person or by proxy shall be counted in determining the presence of a quorum with respect to the question upon which the vote is cast.

Section 5. Voting. Votes may be cast only in person or by proxy as described in the following sentence except that whenever the Condominium Documents specifically require approval by the affirmative vote of more than 50% of all Co-owners, it shall be permissible to vote by a writing duly signed by the designated voting representative not present at a given meeting in person. Proxy voting shall not be permitted except where the designated voting representative is away from home overnight as evidenced by an affidavit signed by him and filed with the Association along with his proxy. Any written votes must be filed with the secretary of the Association at or before the appointed time of each meeting of the members of the Association. Cumulative voting shall not be permitted.

Section 6. Majority. A majority, except where otherwise provided herein, shall consist of more than 50% in value of those qualified to vote and present in person or by prox (or written vote, if applicable) at a given meeting of the members of the Association. Whenever provided specifically herein, a majority may be required to exceed the simple majority hereinabove set forth and may require such majority to be one or both number and value of

designated voting representatives present in person or by proxy, or by written vote, if applicable, at a given meeting of the members of the Association.

ARTICLE IX

MEETINGS

Section 1. Place of Meeting. Meetings of the Association shall be held at the principal office of the Association or at such other suitable place convenient to the Co-owners as may be designated by the Board of Directors. Meetings of the Association shall be conducted in accordance with Sturgis' Code of Parliamentary Procedure, Roberts Rules of Order or some generally recognized manual of parliamentary procedure, when not otherwise in conflict with the Condominium Documents (as defined in the Master Deed) or the laws of the State of Michigan.

Section 2. First Annual Meeting. The First Annual Meeting of members of the Association may be convened only by Developer and may be called at any time after more than 50% in number of the Units in the Project (determined with reference to the recorded Consolidating Master Deed) have been sold and the purchasers thereof qualified as members of the Association. In no event, however, shall such meeting be called later than 120 days after the conveyance of legal or equitable title to non-developer Co-owners of 75% in number of all Units that may be created or 54 months after the first conveyance of legal or equitable title to a non-developer Co-owner of a Unit in the Project, whichever first occurs. Developer may call meetings of members for informative or other appropriate purposes prior to the First Annual Meeting of members and no such meeting shall be construed as the First Annual Meeting of members. The date, time and place of such meeting shall be set by the Board of Directors, and at least 10 days' written notice thereof shall be given to each Co-owner. The phrase "Units that may be created" as used in this paragraph and elsewhere in the Condominium Documents refers to the maximum number of Units which the Developer is permitted, under the Condominium Documents as may be amended, to include in the Condominium.

Section 3. Annual Meetings. Annual meetings of members of the Association shall be held on the second Tuesday of April each succeeding year after the year in which the First Annual Meeting is held at such time and place as shall be determined by the Board of Directors. At such meetings there shall be elected by ballot of the Co-owners a Board of Directors in accordance with the requirements of Article X of these Bylaws. The Co-owners may also transact at annual meetings such other business of the Association as may properly come before them.

Section 4. <u>Special Meetings.</u> It shall be the duty of the President to call a special meeting of the Co-owners as directed by resolution of the Board of Directors or upon a petition signed by 1/3 of the Co-owners presented to the Secretary of the Association. Notice of any special meeting shall state the time and place of such meeting and the purposes thereof. No business shall be transacted at a special meeting except as stated in the notice.

Section 5. <u>Notice of Meetings.</u> It shall be the duty of the Secretary (or other Association officer in the Secretary's absence) to serve a notice of each annual or special meeting, stating the purpose thereof as well as of the time and place where it is to be held, upon each Co-owner of record, at least 10 days but not more than 60 days prior to such meeting. The mailing, postage prepaid, of a notice to the representative of each Co-owner at the address shown in the notice required to be filed with the Association by Article VII, Section 3 of these Bylaws shall be deemed notice served. Any member may, by written waiver of notice signed by such member, waive such notice, and such waiver, when filed in the records of the Association shall be deemed due notice.

Section 6. <u>Adjournment.</u> If any meeting of Co-owner cannot be held because a quorum is not in attendance, the Co-owners who are present may adjourn the meeting to a time not less than 48 hours from the time the original meeting was called.

Section 7. <u>Order of Business.</u> The order of business at all meetings of the members shall be as follows: (a) roll call to determine the voting power represented at the meeting; (b) proof of notice of meeting or waiver of notice; (c) reading of minutes of preceding meeting; (d) reports of officers; (e) reports of committees; (f) appointment of inspector of elections (at annual meetings or special meetings held for purpose of election of Directors or officers); (g) election of Directors (at annual meeting or special meetings held for such purpose); (h) unfinished business; and (i) new business. Meetings of members shall be chaired by the most senior office of the Association present at such meeting. For purposes of this Section, the order of seniority of officers shall be President, Vice President, Secretary and Treasurer.

Section 8. <u>Action Without Meeting.</u> Any action which may be taken at a meeting of the members (except for the election or removal of Directors) may be taken without a meeting by written ballot of the members. Ballots shall be solicited in the same manner as provided in Section 5 for the giving of notice of meetings of members. Such solicitations shall specify (a) the number of responses needed to meet the quorum requirements; (b) the percentage of approvals necessary to approve the action; and (c) the time by which ballots must be received in order to be counted. The form of written ballot shall afford an opportunity to specify a choice between approval and disapproval of each matter and shall

provide that, where the member specifies a choice, the vote shall be cast in accordance therewith. Approval by written ballot shall be constituted by receipt within the time period specified in the solicitation of (i) a number of ballots which equals or exceeds the quorum which would be required if the action were taken at a meeting; and (ii) a number of approvals which equals or exceeds the number of votes which would be required for approval if the action were taken at a meeting at which the total number of votes cast was the same as the total number of ballots cast.

Section 9. <u>Consent of Absentees.</u> The transactions at any meeting of members, either annual or special, however called and noticed, shall be as valid as though made at a meeting duly held after regular call and notice if a quorum be present either in person or by proxy; and if, either before or after the meeting, each of the members not present in person or by proxy, signs a written waiver of notice, or a consent to the holding of such meeting, or an approval of the minutes thereof. All such waivers, consents or approvals shall be filed with the corporate records or made a part of the minutes of the meeting.

Section 10. <u>Minutes, Presumption of Notice.</u> Minutes or a similar record of the proceedings of meetings of members, when signed by the President or Secretary, shall be presumed truthfully to evidence the matters set forth therein. A recitation in the minutes of any such meeting that notice of the meeting was properly given shall be prima facie evidence that such notice was given.

## ARTICLE X

## ADVISORY COMMITTEE

Within 1 year after conveyance of legal or equitable title to the first Unit in the Condominium to a purchaser or within 1"0 days after conveyance to purchasers of 1/3 of the total number of Units that may be created, whichever first occurs, the Developer shall cause to be established an Advisory Committee consisting of at least 2 non-developer Co-owners. The Committee shall be established and perpetuated in any manner the Developer deems advisable, except that, if more than 50% in number and in value of the non-developer Co-owners petition the Board of Directors for an election to select the Advisory Committee, then an election for such purpose shall be held. The purpose of the Advisory Committee shall be to facilitate communications between the temporary Board of Directors and the non-developer Co-owners and to aid the transition of control of the Association from the Developer to purchase Co-owners. The Advisory Committee shall cease to exist automatically when the non-developer Co-owners have the voting strength to elect a majority of the Board of Directors of the Association. The Developer may remove and replace at its discretion at any time any member of the Advisory Committee who has

not been elected thereto by the Co-owners.

ARTICLE XI

BOARD OF DIRECTORS

Section 1. Number and Qualification of Directors. The Board of Directors shall initially be comprised of 3 members and shall continue to be so comprised until enlarged to 5 members in accordance with the provisions of Section 2 hereof. Thereafter, the affairs of the Association shall be governed by a Board of 5 Directors all of whom must be members of the Association, except for the first Board of Directors, or its successors as selected by the Developer. Directors' compensation, if any, shall be set by the affirmative vote of 60% of all Co-owners. Directors of the Association who serve prior to the Transitional Control Date shall receive no compensation.

Section 2. Election of Directors.

(a) First Board of Directors. The First Board of Directors, or its successors as selected by the Developer, shall be composed of 3 persons and such first Board of Directors or its successors as selected by the Developer shall manage the affairs of the Association until the appointment of the first non-developer Co-owners to the Board. Immediately prior to the appointment of the first non-developer Co-owners to the Board, The Board shall be increased in size from 3 persons to 5 persons. Thereafter, elections for non-developer Co-owner Directors shall be held as provided in subsection (b) and (c) below.

(b) Appointment of Non-developer Co-owners to Board Prior to First Annual Meeting. Not later than 120 days after conveyance of legal or equitable title to non-developer Co-owners of 25% in number of the Units that may be created, 1 of the 5 Directors shall be selected by non-developer Co-owners. Not later than 120 days after conveyance of legal or equitable title to non-developer Co-owners of 50% in number of the Units that may be created, 2 of the 5 Directors shall be elected by non-developer Co-owners. When the required percentage levels of conveyance have been reached, the Developer shall notify the non-developer Co-owners and request that they hold a meeting and elect the required Director or Directors, as the case may be. Upon certification by the Co-owners to the Developer of the Director or Directors so elected, the Developer shall then immediately appoint such Director or Directors to the Board to serve until the First Annual Meeting of members unless he is removed pursuant to Section 7 of this Article or he resigns or becomes incapacitated.

(c) Election of Directors At and After First Annual Meeting.

(i) Not later than 120 days after conveyance of legal or equitable title to non-developer Co-owners of 75% in number of the Units that may be created, the non-developer Co-owners shall elect all Directors on the Board, except that the Developer shall have the right to designate at least 1 Director so long as the Units that remain to be created and sold equal at least 10% of all Units that may be created in the Project. Whenever the 75% conveyance level is achieved, a meeting of Co-owners shall be promptly convened to effectuate this provision, even if the First Annual Meeting has already occurred.

(ii) Regardless of the percentage of Units which have been conveyed, upon the elapse of 54 months after the first conveyance of legal or equitable title to a non-developer Co-owner of a Unit in the Project, the non-developer Co-owners have the right to elect a number of members of the Board of Directors equal to the percentage of Units they own, and the Developer has the right to elect a number of members of the Board of Directors equal to the percentage of Units which are owned by the Developer and for which all assessments are payable by the Developer. This election may increase, but shall not reduce, the minimum election and designation rights otherwise established in subsection (i). Application of this subsection does not require a change in the size of the Board of Directors.

(iii) If the calculation of the percentage of members of the Board of Directors that the non-developer Co-owners have the right to elect under subsection (ii), or if the product of the number of members of the Board of Directors multiplied by the percentage of Units held by the non-developer Co-owners under subsection (b) results in a right of non-developer Co-owners to elect a fractional number of members of the Board of Directors, then a fractional election right of 0.5 or greater shall be rounded up to the nearest whole number, which number shall be the number of members of the Board of Directors that the non-developer Co-owners have the right to elect. After application of this formula the Developer shall have the right to elect the remaining members of the Board of Directors. Application of this subsection shall not eliminate the right of the Developer to designate 1 member as provided in subsection (i).

(iv) At the First Annual Meeting 3 Directors shall be elected for a term of 2 years and 2 Directors shall be elected for a term of 1 year. At such meeting all

nominees shall stand for election as 1 slate and the 3 persons receiving the highest number of votes shall be elected for a term of 2 years and the 2 persons receiving the next highest number of votes shall be elected for a term of 1 year. At each annual meeting held thereafter, either 2 or 3 Directors shall be elected depending upon the number of Directors whose terms expire. After the First Annual Meeting, the term of office of each Director (except for 2 of the Directors elected at the First Annual Meeting) shall be 2 years. The Directors shall hold office until their successors have been elected and hold their first meeting.

(v) Once the Co-owners have acquired the right hereunder to elect a majority of the Board of Directors, annual meetings of Co-owners to elect Directors and conduct other business shall be held in accordance with the provisions of Article IX, Section 3 hereof.

Section 3. <u>Powers and Duties.</u> The Board of Directors shall have the powers and duties necessary for the administration of the affairs of the Association and may do all acts and things as are not prohibited by the Condominium Documents or required thereby to be exercised and done by the Co-owners.

Section 4. <u>Other Duties.</u> In addition to the foregoing duties imposed by these Bylaws or any further duties which may be imposed by resolution of the members of the Association, the Board of Directors shall be responsible specifically for the following:

(a) To manage and administer the affairs of and to maintain the Condominium Project and the Common Elements thereof.

(b) To collect assessments from the members of the Association and to use the proceeds thereof for the purposes of the Association.

(c) To carry insurance and collect and allocate the proceeds thereof.

(d) To rebuild improvements after casualty.

(e) To contract for and employ persons, firms, corporations or other agents to assist in the management, operation, maintenance and administration of the Condominium Project.

(f) To acquire, maintain and improve; and to buy, operate, manage, sell, convey, assign, mortgage or lease any real or personal property (including any Unit in the Condominium and easements, rights-of-way and licenses) on

behalf of the Association in furtherance of any of the purposes of the Association.

(g) To borrow money and issue evidences of indebtedness in furtherance of any or all of the purposes of business of the Association, and to secure the same by mortgage, pledge, or other lien, on property owned by the Association; provided, however, that any such action shall also be approved by affirmative vote of 75% of all of the members of the Association in number and in value.

(h) To make rules and regulations in accordance with Article VI, Section 9 of these Bylaws.

(i) To establish such committees as it deems necessary, convenient or desirable and to appoint persons thereto for the purpose of implementing the administration of the Condominium and to delegate to such committees any functions or responsibilities which are not by law or the Condominium Documents required to be performed by the Board.

(j) To enforce the provisions of the Condominium Documents.

Section 5. Management Agent. The Board of Directors may employ for the Association a professional management agent (which may include the Developer or any person or entity related thereto) at reasonable compensation established by the Board to perform such duties and services as the Board shall authorize, including, but not limited to, the duties listed in Sections 3 and 4 of this Article, and the Board may delegate to such management agent any other duties or powers which are not by law or by the Condominium Documents required to be performed by or have the approval of the Board of Directors or the members of the Association.

Section 6. Vacancies. Vacancies in the Board of Directors which occur after the Transitional Control Date caused by any reason other than the removal of a Director by a vote of the members of the Association shall be filled by vote of the majority of the remaining Directors, even though they may constitute less than a quorum, except that the Developer shall be solely entitled to fill the vacancy of any Director whom it is permitted in the first instance to designate. Each person so elected shall be a Director until a successor is elected at the next annual meeting of the Association. Vacancies among non-developer Co-owner elected Directors which occur prior to the Transitional Control Date may be filled only through election by non-developer Co-owners and shall be filled in the manner specified in Section 2(b) of this Article.

Section 7. Removal. At any regular or special meeting of the Association duly called with due notice of the removal action proposed to be taken, any one of the Directors may be removed with

or without cause by the affirmative vote of more than 50% in number and in value of all of the Co-owners and a successor may then and there be elected to fill any vacancy thus created. The quorum requirement for the purpose of filling such vacancy shall be the normal 35% requirement set forth in Article VII, Section 4. Any Director whose removal has been proposed by the Co-owner shall be given an opportunity to be heard at the meeting. The Developer may remove and replace any or all of the Directors selected by it at any time or from time to time in its sole discretion. Likewise, any Director selected by the non-developer Co-owners to serve before the First Annual Meeting may be removed before the First Annual Meeting in the same manner set forth in this paragraph for removal of Directors generally.

Section 8. First Meeting. The first meeting of a newly elected Board of Directors shall be held within 10 days of election at such place as shall be fixed by the Directors at the meeting at which such Director were elected, and no notice shall be necessary to the newly elected Directors in order legally to constitute such meeting, providing a majority of the whole Board shall be present.

Section 9. Regular Meetings. Regular meetings of the Board of Directors may be held at such times and places as shall be determined from time to time by a majority of the Directors, but at least two such meetings shall be held during each fiscal year. Notice of regular meetings of the Board of Directors shall be given to each Director, personally, by mail, telephone or telegraph at least 10 days prior to the date named for such meeting.

Section 10. Special Meetings. Special meetings of the Board of Directors may be called by the President on 3 days' notice to each Director, given personally, by mail, telephone or telegraph, which notice shall state the time, place and purpose of the meeting. Special meetings of the Board of Directors shall be called by the President or Secretary in like manner and on like notice on the written request of two Directors.

Section 11. Waiver of Notice. Before or at any meeting of the Board of Directors, any Director may, in writing, waive notice of such meeting and such waiver shall be deemed equivalent to the giving of such notice. Attendance by a Director at any meetings of the Board shall be deemed a waiver of notice by him of the time and place thereof. If all the Directors are present at any meeting of the Board, no notice shall be required and any business may be transacted at such meeting.

Section 12. Adjournment. At all meetings of the Board of Directors, a majority of the Directors shall constitute a quorum for the transaction of business, and the acts of the majority of the Directors present at a meeting at which a quorum is present shall be the acts of the Board of Directors. If, at any meeting of the Board of Directors, there be less than a quorum present, the

majority of those present may adjourn the meeting to a subsequent time upon 24 hours' prior written notice delivered to all Directors not present. At any such adjourned meeting, any business which might have been transacted at the meeting as originally called may be transacted without further notice. The joinder of a Director in the action of a meeting by signing and concurring in the minutes thereof, shall constitute the presence of such Director for purposes of determining a quorum.

Section 13. First Board of Directors. The actions of the first Board of Directors of the Association or any successors thereto selected or elected before the Transitional Control Date shall be binding upon the Association so long as such actions are within the scope of the powers and duties which may be exercised generally by the Board of Directors as provided in the Condominium Documents.

Section 14. Fidelity Bonds. The Board of Directors shall require that all officers and employees of the Association handling or responsible for Association funds shall furnish adequate fidelity bonds. The premiums on such bonds shall be expenses of administration.

ARTICLE XII

OFFICERS

Section 1. Officers. The Principal officers of the Association shall be a President, who shall be a member of the Board of Directors, a Vice President, a Secretary and a Treasurer. The Directors may appoint an Assistant Treasurer, and an Assistant Secretary, and such other officers as in their judgment may be necessary. Any two offices except that of President and Vice President may be held by one person.

(a) President. The President shall be the chief executive officer of the Association. He shall preside at all meetings of the Association and of the Board of Directors. He shall have all of the general powers and duties which are usually vested in the office of the President of an association, including, but not limited to, the power to appoint committees from among the members of the Association from time to time as he may in his discretion deem appropriate to assist in the conduct of the affairs of the Association.

(b) Vice President. The Vice President shall take the place of the President and perform his duties whenever the President shall be absent or unable to act. If neither the President nor the Vice President is able to act, the Board of Directors shall appoint some other member of the Board to so do on an interim basis. The Vice President shall also perform

such other duties as shall from time to time be imposed upon him by the Board of Directors.

(c) Secretary. The Secretary shall keep the minutes of all meetings of the Board of Directors and the minutes of all meetings of the members of the Association; he shall have charge of the corporate seal, if any, and of such books and papers as the Board of Directors may direct; and he shall, in general, perform all duties incident to the office of the Secretary.

(d) Treasurer. The Treasurer shall have responsibility for the Association funds and securities and shall be responsible for keeping full and accurate accounts of all receipts and disbursements in books belonging to the Association. He shall be responsible for the deposit of all monies and other valuable effects in the name and to the credit of the Association, and in such depositories as may, from time to time, be designated by the Board of Directors.

Section 2. Election. The officers of the Association shall be elected annually by the Board of Directors at the organizational meeting of each new Board and shall hold office at the pleasure of the Board.

Section 3. Removal. Upon affirmative vote of a majority of the members of the Board of Directors, any officer may be removed either with or without cause, and his successor elected at any regular meeting of the Board of Directors, or at any special meeting of the Board called for such purpose. No such removal action may be taken, however, unless the matter shall have been included in the notice of such meeting. The officer who is proposed to be removed shall be given an opportunity to be heard at the meeting.

Section 4. Duties. The officers shall have such other duties, powers and responsibilities as shall, from time to time, be authorized by the Board of Directors.

## ARTICLE XIII

## SEAL

The Association may (but need not) have a seal. If the Board determines that the Association shall have a seal, then it shall have inscribed thereon the name of the Association, the words "corporate seal", and "Michigan".

## ARTICLE XIV

## FINANCE

Section 1. Records. The Association shall keep detailed books of account showing all expenditures and receipts of administration which shall specify the maintenance and repair expenses of the Common Elements and any other expense incurred by or on behalf of the Association and the Co-owners. Such accounts and all other Association records shall be open for inspection by the Co-owners and their mortgagees during reasonable working hours. The Association shall prepare and distribute to each Co-owner at least once a year a financial statement, the contents of which shall be defined by the Association. The books of account shall be audited at least annually by qualified independent auditors; provided, however, that such auditors need not be certified public accountants nor does such audit need to be a certified audit. Any institutional holder of a first mortgage lien on any Unit in the Condominium shall be entitled to receive a copy of such annual audited financial statement within 90 days following the end of the Association's fiscal year upon request therefor. The costs of any such audit and any accounting expenses shall be expenses of administration.

Section 2. Fiscal Year. The fiscal year of the Association shall be an annual period commencing on such date as may be initially determined by the Directors. The commencement date of the fiscal year shall be subject to change by the Directors for accounting reasons or other good cause.

Section 3. Bank. Funds of the Association shall be initially deposited in such bank or savings association as may be designated by the Directors and shall be withdrawn only upon the check or order of such others, employees or agents as are designated by resolution of the Board of Directors from time to time. The funds may be invested from time to time in accounts or deposit certificates of such bank or savings association as are insured by the Federal Deposit Insurance Corporation or the Federal Savings and Loan Insurance Corporation and may also be invested in interest-bearing obligations of the Untied States Government.

## ARTICLE XV

## INDEMNIFICATION OF OFFICERS AND DIRECTORS

Every Director or officer of the Association shall be indemnified by the Association against all expenses and liabilities, including counsel fees, reasonably incurred by or imposed upon him in connection with any proceeding to which he may be a party or in which he may become involved by reasons of his being or having been a Director or officer of the Association,

whether or not he is a Director or officer at the time such expenses are incurred, except in such cases wherein the Director or officer is adjudged guilty of willful or wanton misconduct or gross negligence in the performance of his duties; provided that, in the event of any claim for reimbursement or indemnification hereunder based upon a settlement by the Director or officer seeking such reimbursement or indemnification, the indemnification herein shall apply only if the Board of Directors (with the Director seeking reimbursement abstaining) approves such settlement and reimbursement as being in the best interest of the Association. The foregoing right of indemnification shall be in addition to and not exclusive of all other rights to which such Director or officer may be entitled. At least 10 days prior to payment of any indemnification which it has approved, the Board of Directors shall notify all Co-owners thereof. Further, the Board of Directors is authorized to carry officers' and directors' liability insurance covering acts of the officers and directors of the Association in such amounts as it shall deem appropriate.

## ARTICLE XVI

## AMENDMENTS

Section 1. Proposal. Amendments to these Bylaws may be proposed by the Board of Directors of the Association acting upon the vote of the majority of the Directors or may be proposed by 1/3 or more in number of the Co-owners by instrument in writing signed by them.

Section 2. Meeting Upon any such amendment being proposed, a meeting for consideration of the same shall be duly called in accordance with the provisions of these Bylaws.

Section 3. Voting. These Bylaws may be amended by the Co-owners at any regular meeting or a special meeting called for such purpose by an affirmative vote of not less than 66-2/3% of all Co-owners in number and in value. No consent of mortgagees shall be required to amend these Bylaws unless such amendment would materially alter or change the rights of such mortgagees, in which event the approval of 66-2/3% of mortgagees shall be required with each mortgagee to have one vote for each mortgage held.

Section 4. By Developer. Prior to the Transitional Control Date, these Bylaws may be amended by the Developer without approval from any other person so long as any such amendment does not materially alter or change the right of a Co-owner or mortgagee.

Section 5. When Effective. Any amendment to these Bylaws shall become effective upon recording of such amendment in the office of the County Register of Deeds.

Section 6. Binding. A copy of each amendment to the Bylaws shall be furnished to every member of the Association after adoption; provided, however, that any amendment to these Bylaws that is adopted in accordance with this Article shall be binding upon all persons who have an interest in the Project irrespective of whether such persons actually receive a copy of the amendment.

## ARTICLE XVII

## COMPLIANCE

The Association of Co-owners and all present or future Co-owners, tenants, future tenants, or any other persons acquiring an interest in or using the facilities of the Project in any manner are subject to and shall comply with the Act, as amended, and the mere acquisition, occupancy or rental of any Unit or an interest therein or the utilization of or entry upon the Condominium Premises shall signify that the Condominium Documents are accepted and ratified. In the event the Condominium Documents conflict with the provisions of the Act, the Act shall govern.

## ARTICLE XVIII

## DEFINITIONS

All terms used herein shall have the same meaning as set forth in the Master Deed to which these Bylaws are attached as an Exhibit or as set forth in the Act.

## ARTICLE XIX

## REMEDIES FOR DEFAULT

Any default by a Co-owner shall entitle the Association to the following relief:

Section 1. Legal Action. Failure to comply with any of the terms or provisions of the Condominium Documents shall be grounds for relief, which may include, without intending to limit the same, an action to recover sums due for damages, injunctive relief, foreclosure of lien (if default in payment of assessment) or any combination thereof.

Section 2. Recovery of Costs. In any proceeding arising because of an alleged default by any Co-owner, the Association, if successful, shall be entitled to recover the costs of the proceeding and such reasonable attorneys' fees (not limited to statutory fees) as may be determined by the court.

Section 3. Removal and Abatement. The violation of any of the provisions of the Condominium Documents shall also give the Association or its duly authorized agents the right, in addition to the rights set forth above to enter upon the Common Elements, Limited or General, or into any Unit and the improvements thereon, where reasonably necessary, and summarily remove and abate, at the expense of the Co-owner in violation, any structure, thing or condition existing or maintained contrary to the provi ions of the Condominium Documents. The Association shall have no liability to any Co-owner arising out of the exercise of its removal and abatement power authorized herein.

Section 4. Assessment of Fines. The violation of any of the provisions of the Condominium Documents by any Co-owner shall be grounds for assessment by the Association, acting through its duly constituted Board of Directors, of monetary fines for such violations. No fine may be assessed unless rules and regulations establishing such fine have first been duly adopted by the Board of Directors of the Association and notice thereof given to all Co-owners in the same manner as prescribed in Article IX, Section 5 of these Bylaws. Thereafter, fines may be assessed only upon notice to the offending Co-owners as prescribed in said Article IX, Section 5, and an opportunity for such Co-owner to appear and offer evidence in defense of the alleged violation. All fines duly assessed may be collected in the same manner as provided in Article II of these Bylaws. No fine shall be levied for the first violation. No fine shall exceed $25 for the second violation, $50 for the third violation or $100 for any subsequent violation.

Section 5. Non-waiver of Right. The failure of the Association or of any Co-owner to enforce any right, provision, covenant or condition which may be granted by the Condominium Documents shall not constitute a waiver of the right of the Association or of any such Co-owner to enforce such right, provision, covenant or condition in the future.

Section 6. Cumulative Rights, Remedies and Privileges. All rights, remedies and privileges granted to the Association or any Co-owner or Co-owners pursuant to any terms, provisions, covenants or conditions of the Condominium Documents shall be deemed to be cumulative and the exercise of any one or more shall not be deemed to constitute an election of remedies, nor shall it preclude the party thus exercising the same from exercising such other and additional rights, remedies or privileges as may be available to such party at law or in equity.

Section 7. Enforcement of Provisions of Condominium Documents. A Co-owner may maintain an action against the Association and its officers and Directors to compel such persons to enforce the terms and provisions of the Condominium Documents. A Co-owner may maintain an action against any other Co-owner for injunctive relief or for damages or any combination thereof for

non-compliance with the terms and provisions of the Condominium Documents or the Act.

## ARTICLE XX

## ASSESSMENT OF FINES

Section 1. General. The violation by an Co-owner, occupant or guest of any of the provisions of the Condominium Documents including any duly adopted rules and regulations shall be grounds for assessment by the Association, acting through its duly constituted Board of Directors, of monetary fines against the involved Co-owner. Such Co-owner shall be deemed responsible for such violations whether they occur as a result of his personal actions or the actions of his family, guests, tenants or any other person admitted through such Co-owner to the Condominium Premises.

Section 2. Procedures. Upon any such violation being alleged by the Board, the following procedures will be followed:

(a) Notice. Notice of violation, including the Condominium Document provision violated, together with a description of the factual nature of the alleged offense set forth with such reasonable specificity as will place the Co-owner on notice as to the violation, shall be sent by first class mail, postage prepaid, or personally delivered to the representative of said Co-owner at the address as shown in the notice required to be filed with the Association pursuant to Article VII, Section 3 of these Bylaws.

(b) Opportunity to Defend. The offending Co-owner shall have an opportunity to appear before the Board and offer the evidence in defense of the alleged violation. The appearance before the Board shall be at its next scheduled meeting, but in no event shall the Co-owner be required to appear less than 10 days from the date of the notice.

(c) Default. Failure to respond to the notice of violation constitutes a default.

(d) Hearing and Decision. Upon appearance by the Co-owner before the Board and presentation of evidence of defense, or, in the event of the Co-owner's default, the Board shall, by majority vote of a quorum of the Board, decide whether a violation has occurred. The Board's decision is final.

Section 3. Amounts. Upon violation of any of the provisions of the Condominium Documents and after default of the offending Co-owner or upon the decision of the Board as recited above, the following fines shall be levied:

(a) First Violation. No fine shall be levied.

(b) Second Violation. Twenty-five Dollar ($25.00) fine.

(c) Third Violation. Fifty Dollar ($50.00) fine.

(d) Fourth Violation and Subsequent Violations. One Hundred Dollar ($100.00) fine.

Section 4. Collection. The fines levied pursuant to Section 3 above shall be assessed against the Co-owner and shall be due and payable together with the regular Condominium assessment on the first of the next following month. Failure to pay the fine will subject the Co-owner to all liabilities set forth in the Condominium Documents including, without limitations, those described in Article II and Article XVIII of these Bylaws.

## ARTICLE XXI

## RIGHTS RESERVED TO DEVELOPER

Any or all of the rights and powers granted or reserved to the Developer in the Condominium Documents or by law, including the right and power to approve or disapprove any act, use, or proposed action or any other matter or thing, may be assigned by it to any other entity or to the Association. Any such assignment or transfer shall be made by appropriate instrument in writing in which the assignee or transferee shall join for the purpose of evidencing its consent to the acceptance of such powers and rights and such assignee or transferee thereupon have the same rights and powers as herein given and reserved to the Developer. Any rights and powers reserved or retained by Developer or its successors shall expire and terminate, if not sooner assigned to the Association, at the conclusion of the Construction and Sales Period as defined in Article III of the Master Deed. The immediately preceding sentence dealing with the expiration and termination of certain rights and powers granted or reserved to the Developer is intended to apply, insofar as the Developer is concerned, only to Developer's rights to approve and control the administration of the Condominium and shall not, under any circumstances, be construed to apply or cause the termination and expiration of any real property rights granted or reserved to the Developer or its successors and assigns in the Master Deed or elsewhere (including, but not limited to, access easements, utility easements and all other easements created and reserved in such documents which shall not be terminable in any manner hereunder and which shall be governed only in accordance with the terms of their creation or reservation and not hereby).

## ARTICLE XXII

## SEVERABILITY

In the event that any of the terms, provisions or covenants of these Bylaws or the Condominium Documents are held to be partially or wholly invalid or unenforceable for any reason whatsoever, such holding shall not affect, alter, modify or impair in any manner whatsoever any of the other terms, provisions or covenants of such documents or the remaining portions of any terms, provisions or covenants held to be partially invalid or unenforceable.

LIBER 16071 PG 561

**ATTENTION: COUNTY REGISTER OF DEEDS**

THE CONDOMINIUM SUBDIVISION PLAN NUMBER MUST BE ASSIGNED IN CONSECUTIVE SEQUENCE. WHEN A NUMBER HAS BEEN ASSIGNED TO THIS PROJECT, IT MUST BE PROPERLY SHOWN IN THE TITLE, SHEET 1, AND THE SURVEYOR'S CERTIFICATE, SHEET 2.

OAKLAND COUNTY CONDOMINIUM
SUBDIVISION PLAN № 964

EXHIBIT B TO THE MASTER DEED OF

# PAINT CREEK ESTATES CONDOMINIUM

TOWNSHIP OF OAKLAND, OAKLAND COUNTY, MICHIGAN

__Legal Description__

Land in the Township of Oakland, Oakland County, Michigan, described as:

That part of the West half of the Southeast quarter of Section 20, Town 4 North, Range 11 East, Oakland Township, Oakland County, Michigan, described as follows: Beginning at the South quarter corner of said Section 20, thence N. 01°58'10" E., 2505.16 feet along North and South line of said Section 20; thence S. 47°28'50" E., 1745.89 feet; thence S. 01°51'13" W., 1380.09 feet to a point on the South line of section 20; thence continuing along said South line N. 87°36'06" W., 1329.42 feet to the point of beginning. Containing 2,576,990 square feet or 59.2 acres

INDEX


1. TITLE, DESCRIPTION
2. FLOOD PLAIN PLAN, SURVEY PLAN, UTILITY PLAN, AND TOPOGRAPHIC SURVEY
3. FLOOD PLAIN PLAN, SURVEY PLAN, UTILITY PLAN, AND TOPOGRAPHIC SURVEY (CONTINUED)
4. SITE PLAN
5. SITE PLAN (CONTINUED)



DEVELOPER

J R H W - 17 CORPORATION
5350 GREAT FOSTER
ROCHESTER HILLS, MI 48306
PH. (810) 548-7820



SURVEYOR

NOWAK & FRAUS P.L.L.C.
1310 N. STEPHENSON HIGHWAY
ROYAL OAK, MICHIGAN 48067
(810) 399-0886


PROPOSED 12-28-95

LIBER 16071 PG 562



LIBER 16071 PG 563




PAINT CREEK ESTATES CONDOMINIUM

NOWAK & FRAUS

LIBER 16071 PG 564



LIBER 16071 PG 565




TYPICAL UNIT SECTION
NOT TO SCALE

LEGEND

- LIMITS OF OWNERSHIP
- LIMITED COMMON ELEMENT
- GENERAL COMMON ELEMENT
- CURVE DATA NUMBER
- UNIT COORDINATE POINT

| UNIT NO. | UNIT AREA IN SQ. FT. | AVERAGE GROUND ELEVATION | LIMITED COMMON AREA | UNIT VOLUME IN CUBIC FEET | NORTH COORDINATE | EAST COORDINATE |
|---|---|---|---|---|---|---|
| 11 | 7,134 | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] |
| 12 | 7,170 | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] |
| 13 | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] |
| 14 | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] |

| CURVE | RADIUS | LENGTH | CHORD | BEARING | DELTA |
|---|---|---|---|---|---|
| 9 | 160.00 | [illegible] | [illegible] | [illegible] | [illegible] |
| 10 | 160.00 | [illegible] | [illegible] | [illegible] | [illegible] |
| 11 | 160.00 | [illegible] | [illegible] | [illegible] | [illegible] |
| 21 | 125.50 | [illegible] | [illegible] | [illegible] | [illegible] |
| 22 | 47.00 | [illegible] | [illegible] | [illegible] | [illegible] |
| 23 | 60.00 | [illegible] | [illegible] | [illegible] | [illegible] |
| 24 | 47.00 | [illegible] | [illegible] | [illegible] | [illegible] |
| 25 | 47.00 | [illegible] | [illegible] | [illegible] | [illegible] |
| 26 | 60.00 | [illegible] | [illegible] | [illegible] | [illegible] |
| 27 | 47.00 | [illegible] | [illegible] | [illegible] | [illegible] |
| 28 | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] |

SITE PLAN
PROPOSED 12-28-95

PAINT CREEK ESTATES CONDOMINIUM

NOWAK & FRAUS
Civil Engineers · Land Surveyors

REVISIONS

SCALE: 1" = 80'

# EXHIBIT B










3920






Tyvek
HomeWrap
CertainTeed



# EXHIBIT C



